In re SCHENCK TOURS, INC., Debtor.

Bankruptcy No. 183–32070–353.

United States Bankruptcy Court,
E.D. New York.

Feb. 10, 1987.

Ballon, Stoll & Itzler, New York City, for debtor; Michael Z. Brownstein, and Joseph Bartfield, of counsel.

Heller, Horowitz & Feit, P.C., New York City, for AYL Realty Corp.; Stuart A. Blander, of counsel.

Sherman, Citron & Karasik, P.C., New York City, for creditor; Robert Kolodney, of counsel.

## DECISION

JEROME FELLER, Bankruptcy Judge.

Before the Court is a motion for an order relieving AYL Realty Corp. ("AYL") from a contract of sale for certain real estate owned by the Debtor. The AYL motion arose in the context of a duly noticed hearing, upon application of the Debtor, to sell the subject real estate to AYL, the contract vendee, or any other offeror who may submit a higher or better offer. Hearings on the sale were held on March 4, 1986, March 21, 1986 and April 21, 1986. Another potential bidder surfaced at those hearings who commissioned an environmental report disclosing that the property is severely contaminated. Thereafter, on or about April 30, 1986, AYL filed its motion to be re-lieved from the contract and thereby to obtain the return of its $255,000 down payment, plus the interest accrued thereon. As grounds for the relief, AYL argues, i) the doctrine of commercial frustration, ii) mutual mistake, and iii) that the Debtor is unable to convey marketable title. The Debtor contends that these defenses are inapplicable and that under the contract it is entitled to retain the down payment, plus the interest accrued thereon.

Efforts to resolve the dispute were una-vailing. The parties filed memoranda of law, a stipulation of agreed upon facts dat-ed June 20, 1986 and a stipulation of addi-tional agreed upon facts dated September 23, 1986. A hearing on AYL's motion was held on September 23, 1986, which date, as a technical matter, was also the adjourned date for the hearing on the Debtor's appli-cation to sell the property to AYL or to any other offeror who might submit a higher or better offer. At that time there were no other offerors and AYL was unwilling to go forward with the transaction because of the environmental issue. Instead, AYL pressed for return of its down payment on September 23, 1986 by way of oral argu-ment in support of its April 30, 1986 mo-tion. AYL presented no further evidence in support of its motion.

This Court has jurisdiction to hear and determine this matter by virtue of 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (N) and (O).

Upon review of the stipulations of fact, pleadings, transcripts, memoranda, applica-ble law and for the reasons hereinafter set forth, AYL's motion to be relieved from the contract is denied and the Debtor is entitled to retain the down payment, plus interest accrued thereon, under the terms of the contract as liquidated damages.

Based on the stipulations of fact, neces-sary inferences therefrom and the entire record of these proceedings, the Court makes the following findings of fact.

## FINDINGS OF FACT

1. On October 31, 1983, Schenck Tours, Inc. (hereinafter "Schenck" or "Debtor")

filed a voluntary petition under Chapter 11 of the Bankruptcy Code and since that time has been operating its business and managing its property as a debtor-in-possession.

2. For the period of approximately 50 years prior to its Chapter 11 filing and for a time thereafter, Schenck was engaged in the business of providing public transportation. In connection with its public transportation operations, Schenck maintained an office, a garage facility and maintenance facility for buses on real estate which it owns at or near 372 Jericho Turnpike in Floral Park, New York ("the Property"). Among other things, the buses owned and operated by Schenck were gassed and repaired at facilities located on the Property. A number of gasoline storage tanks used for the storage of gas are located on and/or under the Property.

3. The Debtor's rehabilitation efforts were unsuccessful and during the Chapter 11 case it terminated its public transportation business. As a consequence, the Debtor lapsed into a liquidating reorganization mode and with the Creditors' Committee resolved to sell the Property, Schenck's most important asset. The efforts to sell materialized in the execution of a contract with AYL on January 13, 1986. AYL states that it desired to purchase the Property for the purpose of demolishing the existing buildings thereon and developing the Property as a shopping center or similar retail use.

4. The purchase price for the Property provided for in the contract was $2,550,000 to be paid through a 10% down payment ($255,000), with the balance ($2,295,000) payable upon closing of the transaction. One-half of the deposit ($127,500) was to be paid upon signing of the contract on January 13, 1986. The sum was duly paid by AYL. The second $127,500 was to be paid no later than five business days prior to March 4, 1986, the date noticed by the Debtor for the hearing before the Bankruptcy Court for approval of the transaction. This sum too was duly paid by AYL. The aggregate deposit of $255,000 was paid to Debtor's counsel, who has maintained these funds as escrowee in a separate interest bearing account under the terms of the contract.

5. The Debtor does not seek specific performance of the contract. In that connection, the contract (paragraph 7 of rider) provides that upon default by AYL, the Debtor's "sole and exclusive remedy" is retention of the down payment as liquidated damages.

6. On or about January 3, 1986, representatives of AYL and the Debtor met to further negotiate and discuss terms of a proposed contract of sale of the Property. In light of the public transportation use of the Property for many decades, AYL was understandably concerned about possible environmental problems. Accordingly, during the negotiations, AYL expressed its desire to conduct soil tests prior to executing a contract of sale for the purpose of determining the existence of possible subsurface contamination resulting from environmentally hazardous substances. AYL and the Debtor agreed to schedule a tentative date on or about January 13, 1986 for execution of a contract of sale so as to permit AYL to conduct soil tests.

7. Between January 3 and January 13, 1986, AYL retained Larry E. Tyree Co., Inc. ("Tyree") to drill test holes on the Property for the purpose of causing tests to be conducted on the soil samples extracted. Tyree drilled four (4) test holes and transmitted the samples to Pedneault Associates Inc., a testing laboratory, for the results. In a brief report dated January 9, 1986 ("Pedneault Report"), the testing laboratory, identified the subsurface presence of benzene, toluene, xylene and petroleum products on the Property.

8. On January 13, 1986, representatives of AYL and the Debtor met for the purpose of executing the contract. At this time, AYL had not yet received a written report of the testing laboratory setting forth the results of the soil tests conducted on the Property. At the January 13, 1986 meeting, and prior to the signing of the contract, the Debtor told AYL that if it

wished, it could defer signing the contract until receipt of such written report.

9. The parties executed the contract at the January 13, 1986 meeting and AYL made the required $127,500 deposit to the Debtor. The contract contained no provision excusing performance by AYL in the event of environmental problems associated with the Property. AYL does not contend that there was any fraud, deception, misrepresentation or bad faith by the Debtor concerning the environmental condition of the Property. Indeed, the record reflects that the Debtor made no representations concerning these matters.

10. On or about January 14, 1986, AYL received the January 9, 1986 written report of Pedneault Associates, Inc. Upon receipt of the report, counsel for AYL contacted counsel for the Debtor. AYL's counsel informed Debtor's counsel that the Pedneault Report reflected certain soil contamination problems. After discussions, counsel for AYL and counsel for the Debtor agreed that Debtor would forbear from noticing a hearing and from making application to the Bankruptcy Court for approval of the sale of the Property. The purpose of the forbearance was to enable AYL to pursue further testing to attempt to determine the magnitude of the contamination problem, if any.

11. Thereafter, AYL retained Marine Pollution Control, Inc. ("Marine Pollution") to drill additional wells on the Property. In a report dated January 29, 1986 ("Marine Report"), Marine Pollution stated its conclusions. Those conclusions were indecisive. The Marine report reads as follows:

"As you requested, Marine Pollution Control, Inc. has made 3 follow-up visits to the above location.

The data enclosed shows the well installed January 22, 1986 to be free of product on January 24, 27, and 29, 1986. Since the monitoring period was so brief, it is impossible to make an all conclusive assessment of the subsurface conditions at this time. Despite the fact that there was containmated (sic) soil encountered during the drilling operation, it does ap-

pear at this time that groundwater may not have been affected."

12. AYL states that it also requested Marine Pollution to estimate the cost of the work necessary to remedy the contamination problem on the Property. Marine Pollution, according to AYL, orally told AYL that it estimated that an initial cleanup of the Property would cost approximately $50,000, and that an additional $250,000 for monitoring over the next five to ten year period might also be required.

13. In light of the information which it received from Marine Pollution regarding the scope, extent and estimated cost of remedying the problem, AYL informed the Debtor that it would be willing to proceed with the contract.

14. Subsequently, on January 31, 1986 a certain amendment to the contract was executed not here relevant and an application was made to the Court to consider the sale of the Property to AYL or any other higher or better offer. The now amended contract of January 13, 1986 contained no provision excusing performance by AYL in the event of environmental problems. The hearing on the sale was noticed for March 4, 1986. Prior thereto, AYL made the additional $127,500 down payment of the purchase price pursuant to the terms of the contract.

15. At the hearing on March 4, 1986, the Village of Floral Park ("Floral Park") appeared and expressed its possible interest in acquiring the Property for use as a municipal parking garage. Floral Park requested an adjournment to obtain approval of a referendum on a bond resolution. The hearing was adjourned to March 21, 1986, at which time Floral Park reported approval of the referendum, but requested a further adjournment to conduct its own environmental tests because of information that recently came to the Village's attention. The hearing was adjourned to April 21, 1986.

16. Floral Park commissioned soil tests of the Property to be conducted by Seelye Stevenson Value & Knecht. A report dated April 15, 1986 ("Seelye Report") was

submitted to Floral Park and circulated to, among others, AYL. Based upon the Seelye Report, Floral Park informed the Court on April 21, 1986 that it was no longer interested in acquiring the Property and AYL filed its motion seeking to be relieved from the January 13, 1986 contract of sale and the return of its down payment.

17. The Seelye Report, without addressing possible off-site contamination, disclosed serious environmental problems associated with the Property; but at the same time stressed that its $2.5 million estimated cleanup cost represents a maximum cleanup cost which may or may not be required by the New York State Department of Environmental Conservation ("NYSDEC"). The Seelye Report concluded as follows:

"The total cleanup cost of the site will run approximately $2.5 million. This estimate includes only the cost of cleanup of the soils and ground water under the Schenck Bus Company site and does not include any future liability for contamination which has migrated off-site. It should be stressed that this involves a maximum cleanup of the site which may or may not be required by the New York State Department of Environmental Conservation. The degree of the cleanup can not [sic] be ascertained until the NYSDEC reviews the lab findings and determines the possible contamination impacts to the aquifer and residential business areas surrounding the site.

Based upon the above information and the inherent future liability risks to the Village of Floral Park it is our recommendation that the site not be purchased by the Village.

However should the Village be able to obtain additional time for investigation of the site, the New York State Department of Environmental Conservation should be requested to expedite review of the lab analysis to determine the degree of cleanup required at the site."

18. On May 29, 1986, at the suggestion of the Court, representatives of the Debtor, AYL, Creditors' Committee and Floral Park met with representatives of the NYS-DEC at Stony Brook, New York.

19. After the representatives of the NYSDEC reviewed the Pedneault, Marine and Seelye Reports of the tests which had been conducted on the Property, and based solely upon such reports and the information provided by the participants at the meeting, the NYSDEC representatives advised the following:

(a) the NYSDEC could not, at this time, give any definitive analysis of the extent of the problem and the cost of any necessary remedial work;

(b) based on their preliminary review, the environmental problem with respect to the Property appeared to be a serious one;

(c) the most potentially serious and expensive problem—possible off-site contamination—was not addressed in any of the soil reports;

(d) the NYSDEC investigation and evaluation process involves various phases of soil investigation and analysis and development of a remedial investigation feasibility study. The minimum time frame for completing this study is six months to one year. Completion of the necessary evaluative work and development of an actual cleanup plan by NYSDEC will take substantially longer. The time frame for development of the feasibility study could be shortened if an interested party chose to fund the necessary testing and study, rather than relying on State funding.

20. In light of the apparent environmental problems and the Seelye Report, a lender would be extremely reluctant to advance financing for the purchase and development of the Property to be secured by the Property alone.

## COMMERCIAL FRUSTRATION

Sanctity of contract constitutes the most fundamental underpinning of commerce. The community's legitimate need for the stability of business dealings requires the enforcement of contracts according to their terms. This need finds cogent expression

in a strong public policy of upholding the validity of freely negotiated contracts, even unwise ones. Courts do not generally relieve a party competent to contract from an improvident agreement in the absence of fraud, misrepresentation or bad faith. *Hogan v. Wright*, 356 F.2d 595, 598 (6th Cir. 1966); *Miller & Neill Company v. Bauders (In re Miller & Neill Company)*, 41 B.R. 589, 593 (Bankr.N.D.Ohio 1984). Although easily said, these sound principles are often vexing and difficult in application to factual patterns where a party to an agreement asserts well-established contractual defenses other than fraud, misrepresentation or bad faith. One of such defenses is the commercial frustration doctrine.

■ The doctrine of commercial frustration is an ancient concept rooted in the common law. *United States v. General Douglas MacArthur Senior Village, Inc.*, 508 F.2d 377, 381 (2nd Cir.1974); *Megan v. Updike Grain Corporation*, 94 F.2d 551, 553 (8th Cir.1938). The doctrine is appropriately triggered where i) a contingency—something unanticipated, unforseeable or unexpected—has occurred, ii) the risk of the unexpected occurrence has not been allocated by agreement or otherwise; and iii) both parties can perform the contract but, as a result of the unforeseeable events, performance by one party would no longer give the other party what induced him to make the bargain in the first place. Thus frustrated, the latter party may rescind the contract. In essence, then, excuse of performance by reason of commercial frustration represents a judicial allocation of risk recognizing and enforcing what can reasonably be inferred to be the intent of the parties at the time of contract. *See, United States v. General Douglas MacArthur Senior Village, Inc., supra*, 508 F.2d at 381. The commercial frustration doctrine has been formulated in the Restatement (Second) of Contracts at § 265 as follows:

"Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of

which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary."

Perhaps the most significant factor in the determination as to the applicability of the commercial frustration doctrine is the foreseeability of the contingency that actually occurred. In terms of the more customary contract law jargon, this is very much like trying to determine whether the party invoking commercial frustration assumed the risk. Obviously, if a contingency is reasonably forseeable and nonetheless the agreement fails to provide protection in the event of its occurrence, the party adversely affected will be deemed to have assumed the risk. Accordingly, there is abundant authority for the precept that commercial frustration is no defense where the intervening event was reasonably foreseeable and where, nonetheless, no safeguarding provisions were made for what actually occurred. *Raner v. Goldberg*, 244 N.Y. 438, 155 N.E. 733 (1927); *Frenchman & Sweet, Inc. v. Philco Discount Corporation*, 21 A.D.2d 180, 249 N.Y.S.2d 611 (4th Dept.1964); *119 Fifth Avenue v. Taiyo Trading Co.*, 190 Misc. 123, 73 N.Y.S.2d 774 (Special Term 1947), *aff'd*, 275 A.D. 695, 87 N.Y.S.2d 425 (1949); *VJK Productions, Inc. v. Friedman/Meyer Productions, Inc.*, 565 F.Supp. 916, 920–921 (S.D.N.Y.1983); *M & M Transportation Company Inc. v. Schuster Express Inc.*, 13 B.R. 861, 870 (Bankr.S.D.N.Y.1981); *In re North Broadway Funding Corp.*, 6 B.R. 133, 135 (Bankr.E.D.N.Y.1980).

■ AYL's main argument in support of its motion is that the commercial frustration doctrine permits it to, in effect, rescind its January 13, 1986 contract to purchase the Property from the Debtor and thereby recover its $255,000 down payment. AYL's position rests upon the Seelye Report disclosing serious environmental problems and potential cleanup costs equal to the contract purchase price, i.e. $2.5 million, and, in addition, raising a further spectre of possible future liability for contamina-

tion which may have migrated off site. AYL contends that these problems have totally destroyed the value of the Property and therefore effectively frustrated its purpose of entering into the contract. Although enticing, the initial attractiveness of AYL's commercial frustration arguments evaporates upon closer scrutiny.

The Property was used by the Debtor in its public transportation business for more than one-half a century by the time AYL entered into the contract. In that connection, buses were maintained, gassed and repaired on the Property. Gasoline storage tanks were located on and/or under the Property. The existence of subsurface contamination from environmentally hazardous substances was clearly foreseeable and AYL was surely aware of that possibility. Indeed, AYL commissioned a soil report prior to signing the contract. Nonetheless, in the exercise of its business judgment, AYL signed, with apparent enthusiasm, a contract unqualifiedly promising to purchase the Property subject to appropriate bankruptcy procedures and paid the Debtor a portion of the down payment, all before it even received the written soil report that it commissioned. That information, the Pedneault Report, indicated the existence of environmental problems.[1] AYL sought further information regarding hazardous substances and requested an adjournment of the bankruptcy court hearing to acquire such information. The Debtor accomodated AYL's request. The second report, the Marine Report, was inconclusive on its face. Nonetheless, AYL, again in the exercise of its business judgment, paid the second $127,500 of the down payment and instructed the Debtor to proceed with the transaction. At no time did the contract contain exculpatory language and we can only assume that, under all the circumstances, AYL consciously and deliberately assumed the risk of environmental problems associated with the Property.

AYL protests vigorously that the extent of the contamination, related potential cleanup costs and other possible liability disclosed by the subsequent Seelye Report constitute unforeseeable contingencies. It cannot be gainsaid, however, that AYL for reasons known only to it chose to ignore, disbelieve or dismiss the possibility of serious environmental problems. "[W]here ... difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused." *407 E. 61st Garage, Inc. v. Savoy Corp.*, 23 N.Y.2d 275, 281, 244 N.E.2d 37, 41, 296 N.Y.S.2d 338, 344.

■ Even giving AYL the benefit of the doubt that it would be unfair to expect it to have prophesied the magnitude of the problem disclosed in the Seelye Report, it is clear that it was in a position to protect itself contractually from risk of the problem. If, where as here, a buyer needs special protection, he must so provide in the contract. He can dictate its terms, such as excusing performance if contamination is beyond a certain magnitude, and refuse to contract unless it is given. As observed by Judge Lehman in *Raner v. Goldberg, supra*, 244 N.Y. at 441, 155 N.E. 733:

> "It is clear that a person who makes an absolute promise to pay may not be excused from performance because of the happening of a contingency which destroys the value of the stipulated consideration for such payment where inference is reasonable that an express condition so providing would have been inserted in the contract had the parties so intended. Where the promisor has knowingly chosen to make an absolute promise, he may not afterwards claim relief because subsequent events show that the choice was ill-advised. 'The test seems to be whether the event ... was or might have been guarded against.'"

1. The parties disagree as to whether AYL had received an oral report with respect to the soil tests prior to executing the contract. AYL contends it did not; the Debtor contends that it was told by AYL that AYL had received an oral report with respect to the soil.

Moreover, it should be emphasized that the record contains no clear cut evidence as to the extent of contamination, cleanup cost and other possible liability pertaining to the Property's environmental problems. The Seelye Report is at odds with the Pedneault and Marine Reports. The NYSDEC is non-committal. According to Marine's oral report given to AYL, the estimated cost of cleanup ranges from $50,-000 initially, plus $250,000 for additional monitoring over a protracted period of time. The Seelye Report, as indicated, estimates a $2.5 million cleanup cost, plus other possible liabilities. Thus, assuming arguendo that the contingency was unforeseeable, in the absence of further evidence of AYL enabling the Court to make firm findings relating to the scope of the environmental problems, AYL has failed to sustain its burden that its principal purpose in entering the transaction has been substantially frustrated.

Apparently aware of this flaw in its position, AYL argues that the Seelye Report itself constitutes proof of frustration because of "the apparent environmental problems and the April 15 Seeley [sic] Report, a lender would be extremely reluctant to advance financing for the purchase and development of the Property to be secured by the Property alone." Stipulation of Additional Facts, dated September 23, 1986. AYL does not explain, however, why it failed to include in the contract a mortgage contingency clause. Furthermore, there are other ways to finance a real estate transaction other than using the real estate as security.

In sum, AYL should not be excused from what may have become a hard bargain under the principle of commercial frustration. Equity does not relieve from hard bargains merely because they are such. Here, AYL's frustration is really disappointment that known risks it assumed may well be more serious than it had hoped and that it failed to guard against such possibility in the contract. A party may not abrogate a contract just because it might be financially disadvantageous to perform it. If such abrogation would be permitted, all commercial contracts would be placed in dire jeopardy. As the bankruptcy court in *M & M Transportation Company, Inc. v. Schuster Express, Inc. (In re M & M Transportation, Inc.), supra* 13 B.R. at 868, stated:

> "Equity should not intrude itself where knowledgeable parties contract and where they have not been overborne by actions of the other party."

## MUTUAL MISTAKE

Based upon the principle that a contract is voidable if entered into under a mutual mistake of fact, AYL further urges that the contract should be rescinded because both AYL and the Debtor executed the contract on the mistaken belief that the Property did not have the serious contamination problems revealed by the Seelye Report. Had these problems been known, the argument continues, the parties would not have executed the contract. This contention too does not withstand analysis.

The mere invocation of the term "mutual mistake" is not a talisman behind which a defaulting party to an agreement may hide. The proper application of the mutual mistake defense is set out in the Restatement of Contracts. In relevant part, the Restatement provides:

> "Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party *unless he bears the risk of the mistake under the rule stated in § 154.*" Restatement (Second) Contracts § 152. [Emphasis Added].

> "A party bears the risk of a mistake when (a) the risk is allocated to him by agreement of the parties, or (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient...." Restatement (Second) Contracts § 154.

■ The contract herein strongly suggests that the risk of environmental problems was allocated to AYL under the agreement. *Cf., Beecher v. Able,* 575 F.2d 1010 (2d Cir.1978). The contract states expressly that AYL examined the property and is familiar with its physical condition, and further recites that the Debtor made no representations regarding the physical condition of the property.[2] In any event, it is undisputed that the Debtor disclaimed any views or assumptions regarding the environmental status of the Property. Thus, even if a mistake existed, it was, at best, a unilateral one on the part of AYL. Where a mistake is unilateral, a contract is not voidable on the grounds of mutual mistake. *Leasco Corporation v. Taussig,* 473 F.2d 777, 781 (2d Cir.1972); *Covich v. Chambers,* 8 Mass.App. 740, 397 N.E.2d 1115, 1121 (1979); *Gunnell v. Nello L. Teer Company,* 205 Va. 28, 135 S.E.2d 104, 107 (1964); Comment a. to Restatement (Second) Contracts § 153 ("Courts have traditionally been reluctant to allow a party to avoid a contract on the ground of mistake, even as to a basic assumption, if the mistake was not shared by the other party").

■ Moreover, AYL knew or should have known that it had limited knowledge regarding the environmental facts when it entered into the transaction. Nevertheless, AYL apparently deemed such knowledge sufficient. In its rush to lock up the deal, AYL voluntarily opted to rely upon brief soil reports it commissioned which were inconclusive and incomplete on their face.[3] AYL took a business risk and must bear the consequences of what may well have been an unwise decision. If the unwise decision causes a loss of the down payment, the loss should fall on the party who made that decision. Contract avoidance on the grounds of mutual mistake is not permitted just because one party is disappointed in the hope that the facts accord with his wishes. *Backus v. MacLaury,* 278 A.D. 504, 106 N.Y.S.2d 401 (4th Dep't. 1951). As Comment c. to the Restatement (Second) Contracts § 154 aptly points out:

> "Even though the mistaken party did not agree to bear the risk, he may have been aware when he made the contract that his knowledge with respect to the facts to which the mistake relates was limited. If he was not only so aware that his knowledge was limited but undertook to perform in the face of that awareness, he bears the risk of mistake. It is sometimes said in such a situation that, in a sense, there was not mistake but 'conscious ignorance.'"

## MARKETABLE TITLE

■ After invoking the equitable defenses of commercial frustration and mutual mistake, AYL in an extraordinary turnabout argues, as its final defense, that the Debtor is unable to convey marketable title in light of the contamination and related cleanup costs associated with the Property disclosed in the Seelye Report. In that connection, AYL refers to paragraph 5 of the rider to the contract granting the purchaser the right to rescind and obtain return of its down payment "in the event title is unmarketable." The marketability de-

---

**2.** In relevant part, the contract provides as follows:

"The Purchaser [AYL] has examined the premises agreed to be sold and is familiar with the physical condition thereof. The Seller [Debtor] has not made and does not make any representations as to any other matter or thing affecting or relating to the aforesaid premises ... and the Purchaser [AYL] hereby expressly acknowledges that no such representations have been made...." Paragraph 2 of Rider to Contract.

"... Purchaser [AYL] further acknowledges that ... neither the Seller [Debtor] nor any agent or representative of Seller [Debtor], have made ... any express or implied warranties, guarantees, promises, statements, inducements, representations or information pertaining to the property, including but not limited to ... the physical condition thereof...." Paragraph 3 of Rider to Contract.

**3.** AYL's contention that on January 13, 1986, the date the contract was signed, it had not yet even received an oral report of the random soil tests conducted by Tyree, buttresses our conclusion that AYL had limited knowledge of the environmental facts at the time of contract and yet deemed such knowledge sufficient. *See,* footnote 1, *supra.*

fense is not tenable in that there is no question that the Debtor possesses unencumbered ownership of the Property and, even more importantly, it is equally clear that AYL assumed responsibility for all violations of law, including environmental matters.

AYL contends that because the federal government might assess response costs [4] against AYL as purchaser of the Property under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601, et seq., there is a "de facto" lien on the Property. The lien terminology used by AYL does not make it so. It is plain that violations or restrictions imposed by law, which are in existence at the time of contract, are not ordinarily deemed encumbrances as may be availed of by a vendee to avoid his agreement to purchase. 62 N.Y.Jur., *Vendor and Purchaser*, § 73 at 308. Moreover, AYL has supplied no authority for the proposition that a so-called "de facto" lien under CERCLA constitutes a defect in ability to tender marketable title.[5]

Most importantly, rescission on the grounds of unmarketability of title because of environmental problems was not within the contemplation of the parties when they executed the contract. AYL agreed to accept the Property, subject to all violations of laws or governmental requirements, including environmental matters. Typed into the printed portion of the contract at paragraph 7 and immediately preceding references to violations of law and governmental requirements is language stating that, "Purchaser [AYL] shall accept title subject to any . . . ." Further, paragraph 4H. of the rider to the contract reads:

"4. The premises are further being sold subject to the following:

. . . .

H. Violations of laws, regulations, ordinances, orders or requirements, if any, noted in or issued by any governmenal [sic] or municipal department or authority having jurisdiction over the Premises noted or issued subsequent to the date hereof, and any conditions constituting such violations, although not so noted or issued."

It is evident from these provisions of the contract that AYL waived any contentions of defects in marketability arising out of environmental violations of law, regulation or other governmental requirements. To read those provisions otherwise would in effect rewrite the contract, something this Court declines to do.

## CONCLUSION

For all of the foregoing reasons, AYL's defenses of commercial frustration, mutual mistake and unmarketability are rejected. Accordingly, AYL's motion seeking relief from its contract to purchase the Property is denied and the Debtor is entitled to retain the $255,000 down payment, plus accrued interest thereon, as liquidated damages, in accordance with paragraph 7 of the rider to the contract. No costs to either party.

AYL has defaulted in determining that it does not wish to go forward with the transaction. AYL has such a right under paragraph 7 of the rider to the contract. The price AYL must pay, however, for the exercise of that contractual right is forfeiture of its down payment. There being no pending objections to the sale to AYL, the proposed sale would have gone forward under

---

4. Response costs are the costs of removing hazardous substances from the environment. Under CERCLA, response costs are assessed against the owner of the site when the federal government, under circumstances delineated in the statute, removes or arranges for removal of the hazardous substances. Response costs, however, are not assessed if the owner properly undertakes to remedy the situation.

5. AYL suggests that pending legislation in the New York State legislature (Assembly Bill 5794–D, introduced March 13, 1985) would make the "de facto" lien into an express lien with superpriority status. The fact is, however, that this is only a proposed law and accordingly has no bearing on the issue of marketability raised by AYL. If AYL was legitimately concerned about its passage, appropriate exculpatory language should have been included in the contract.

the bankruptcy laws without any further court action. 11 U.S.C. § 102(1) and § 363(b); H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 315 (1977); S.Rep. No. 95–989, 95th Cong., 2nd Sess. 27 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787; *In re Hanline*, 8 B.R. 449 (Bankr.N.D.Ohio, W.D.1981). Sadly for both parties—AYL because it must lose its down payment and the Debtor because it will be further delayed in completing its Chapter 11 case—the proposed sale cannot be consummated.

SETTLE ORDER ON THREE (3) DAYS NOTICE.