**HARBOR INSURANCE COMPANY, a California Corporation; Continental Insurance Company, a New Hampshire Corporation, Appellees,**

v.

**John David STOKES; Carolyn Ramsey Stokes, Appellants.**

No. 93–7128.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 17, 1994.

Decided Feb. 3, 1995.

Barry C. Hansen, Washington, DC, argued the cause for appellants. With him on the briefs was Michael J. Pangia, Washington, DC.

Robert E. Heggestad, Washington, DC, argued the cause and filed the brief for appellees.

Before: WILLIAMS, GINSBURG and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The parties in an earlier litigation entered into a compromise settlement late one Friday afternoon. The following Monday morning they learned that this court, on the day before the settlement, had decided that lawsuit in favor of the plaintiffs. Those plaintiffs, John and Carolyn Stokes, who are defendants here, understandably resisted implementation of the settlement, which deprived them of over $170,000 (about 5% of the total judgment) that they would otherwise have secured by their total victory in this court. (For simplicity's sake, the rest of the opinion will refer just to the injured husband, "Stokes"). Harbor and Continental (collectively "Harbor"), the original defendant's insurers, sued Stokes in district court for breach of contract. The district court granted judgment for Harbor, rejecting Stokes's defense of mutual mistake of fact. Because Stokes and Harbor acted in conscious ignorance of the uncertainties about both the outcome of the case and its timing, we too reject that defense and affirm the judgment of the district court.

\*     \*     \*

Stokes sued George Hyman Construction Company for damages as a result of injuries sustained in 1984. At trial he won jury verdicts totalling $3,287,057, and on July 22, 1991 the district court entered judgment in his favor in that amount, with provision for "costs" as well. Interest on the judgment accrued as a matter of law. D.C.Code § 15–109 (1981).

Hyman filed a timely appeal to this court, and both parties filed motions for summary disposition. Stokes's counsel, Michael Pangia (whose testimony controls for purposes of evaluating the district court's grant of summary judgment), testified that he created his motion out of whole cloth, filing it without any knowledge that a motion for summary affirmance existed or was ever granted.[1] Pangia thus did not expect a summary out-

---

1. In fact, motions for summary affirmance did and do exist; Pangia did not coin the procedure. See, e.g., *Cascade Broadcasting Group, Ltd. v. FCC*, 822 F.2d 1172, 1174 (D.C.Cir.1987) (per curiam); *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297–98 (D.C.Cir.1987) (per curiam); see also Handbook of Practice and Internal Procedures, United States Court of Appeals for the District of Columbia Circuit, at 36 (1987) (providing in § VII.E. for "Disposition by a Panel" of "motions for summary affirmance"); General Rules of the United States Court of Appeals for the District of Columbia Circuit, Rule 7(i) (1991) (concerning "Dispositive Motions"); *id.* at A–4 (indicating that motions for summary affirmance are included in the category of dispositive motions); Handbook of Practice and Internal Procedures, United States Court of Appeals for the District of Columbia Circuit, at 75 (providing at § VIII. G. for "Motions for Summary Disposition") (1993).

come; rather, he thought that "by the time we got a briefing schedule, an argument scheduled and a decision, ... it would very likely be another year if we were lucky." According to Pangia, counsel for Harbor expected the same and said so to Pangia repeatedly.

By the time these motions were filed, John Stokes had been out of work for eight years. He and his family were, in Pangia's words, "literally starving and living on borrowed money." Stokes had begun to consider advice on filing personal bankruptcy. Destitute, he was generally frustrated "about how long the Court of Appeals was taking with these matters." Thus, despite Pangia's asserted confidence that Stokes would eventually prevail in court, he began settlement negotiations in March 1992, so that he could get his money as soon as possible.

By the beginning of June 1992 the parties had come very close to settlement, but could not bridge a final gap. Harbor offered $3.2 million and would go no higher; Stokes was willing to take the face value of the verdict, $3.287 million, without interest and costs (which then aggregated $170,000–$200,000), but would go no lower.

After several weeks at this impasse, Harbor changed negotiators. The new negotiator, Robert Masterson, contacted Pangia on Friday, June 26 and said that Harbor had instructed him to settle immediately. Pangia was also apparently eager to settle the matter quickly, because he was leaving the next Tuesday on a trip to Russia. Pangia reiterated his demand for the full $3.287 million. After confirming his authority to settle for this amount, Masterson called Pangia back and offered to settle on Pangia's terms. Pangia immediately faxed his acceptance of Masterson's offer, concluding a settlement contract at about 5 PM on the 26th.

Unbeknownst to both parties, this court had entered an order on Thursday, June 25, granting Stokes's Motion for Summary Affirmance and denying Hyman's Motion for Summary Reversal. On Monday, June 29, both parties received notice of the decision in the mail. Pangia contacted Masterson and repudiated the settlement contract.

Harbor sued for breach of contract in the district court. Stokes raised the defense of mutual mistake of fact and also counterclaimed, asserting that Harbor knew of this court's order before the settlement and fraudulently failed to alert Stokes. The trial court dismissed the counterclaim, on the ground (among others) that Stokes had offered no evidence whatsoever that Harbor had learned of the order before the settlement. The district court then granted Harbor's motion for summary judgment, holding that there was no mutual mistake of fact because Stokes failed to show the alleged mistake had a material effect on the agreed exchange of performances. Stokes appeals the judgment, but here he neither claims error in dismissal of the counterclaim nor asserts that Harbor had any pre-settlement knowledge of this court's summary affirmance.

\* \* \*

Because we are reviewing the district court's grant of a motion for summary judgment, our review is *de novo*. *Shields v. Eli Lilly & Co.*, 895 F.2d 1463, 1466 (D.C.Cir. 1990). Moreover, we may affirm the judgment of the district court on the basis of a different legal theory. *Larson v. Northrop Corp.*, 21 F.3d 1164 (D.C.Cir.1994). As it turns out, we do not reach the materiality issue.

██ Under the doctrine of mutual mistake, "a contract may be rescinded if the contracting parties entertained a material mistake of fact that went to the heart of their bargain." *Bituminous Coal Operators' Ass'n v. Connors*, 867 F.2d 625, 635 (D.C.Cir. 1989). We assume arguendo that the parties' mistake—as to whether this court had made a final disposition of the underlying action—was mutual, material, and "went to the heart of the bargain." But as the doctrine essentially allows a party to avoid a contract—and thus the risk of a particular mistake, it is necessarily inapplicable if the court finds that that party bore the risk. Restatement (Second) of Contracts §§ 152, 154 (1981); see *Flippo Construction Co., Inc. v. Mike Parks Diving Corp.*, 531 A.2d 263, 272 (D.C.1987). In *Flippo*, the D.C. Court of Appeals specifi-

cally adopted § 154 of the Restatement, which reads as follows:

> § 154. When a Party Bears the Risk of a Mistake.
>
> A party bears the risk of a mistake when
>
> (a) the risk is allocated to him by agreement of the parties, or
>
> (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
>
> (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

In the comments to § 154(b), the Restatement reformulates treating "limited knowledge as sufficient" as "conscious ignorance":

> c. *Conscious ignorance.* Even though the mistaken party did not agree to bear the risk, he may have been aware when he made the contract that his knowledge with respect to the facts to which the mistake relates was limited. If he was not only so aware that his knowledge was limited but undertook to perform in the face of that awareness, he bears the risk of the mistake. It is sometimes said in such a situation that, in a sense, there was not mistake but "conscious ignorance."

Restatement (Second) of Contracts § 154 cmt. c. (1981).

The Restatement has quite logically set "conscious ignorance" in a section explicitly addressing risk allocation. Every time parties enter a contract, they act with incomplete information. They make judgments about the desirability of acquiring (and waiting for) additional information, and of creating specific contractual provisions to handle particular eventualities. Where they have been explicitly concerned about an issue, but decide to press forward without further inquiry or explicit provision, it is reasonable to suppose that they intend the contract to dispose of the risk in question, i.e., to bar any reopening at the behest of the party who, it turns out, would have done better without the contract. Thus, in *Thompson v. Lane,* 226 Kan. 437, 601 P.2d 1105 (1979), the parties to a probate proceeding entered a settlement because although they "knew that a will had been written and executed[, t]hey were uncertain whether it had been revoked, destroyed, lost or merely mislaid." 226 Kan. at 441, 601 P.2d at 1109. When the will later turned up and the party who would have done better under the will complained, the court held the parties to the settlement: "In order for a mistake to have legal significance and to constitute a basis for invalidating a compromise, it must be based upon the parties' unconscious ignorance; it must not relate to one of the uncertainties of which the parties were conscious and which it was the purpose of the compromise to resolve and put at rest." *Id.* (internal quotations omitted). See also *Florida Power & Light Co. v. Westinghouse Electric Corp.,* 517 F.Supp. 440, 458 (E.D.Va.1981) (denying rescission to party that entered long-term contract at what proved to be improvident prices, as it agreed to the price schedule in "conscious ignorance" of the determinants of its costs); *In re Schenck Tours, Inc.,* 69 B.R. 906, 914 (Bankr.E.D.N.Y.1987) (refusing to relieve land purchaser from contract where it "voluntarily opted to rely upon brief soil reports ... which were inconclusive and incomplete on their face").

By contrast, where the subject of uncertainty has not been a concern of the parties, i.e., where the post-contract discovery comes out of left field, an inference of intentional risk allocation is questionable. Cf. *Finch v. Carlton,* 84 Wash.2d 140, 524 P.2d 898 (1974) (excusing victim of auto accident from release he signed when he thought he had suffered no personal injury and settled for cost of repairing his car, where latent injuries not contemplated by the parties later appeared).

■ Here, in arguing that the mistake concerned a basic assumption underlying the contract, Stokes has urged that his key concern was the timing of judgment. (He would have faced great difficulties in showing mutual mistake if he had said that his primary purpose was to substitute an agreed and therefore certain sum for a risky distribution of outcomes, and to avoid further litigation costs.) It is obvious that he was ignorant of when the decision would issue (or had is-

sued), and that he was fully aware of his ignorance.

It might be argued on Stokes's behalf that although he was consciously ignorant of the *range* of possible times when judgment might issue, he never consciously entertained the thought that the court had *already* acted. But that eventuality was simply the limiting case of the known range of possibilities, and we do not think Stokes can carve the range up into diminutive segments, asserting unconscious ignorance of the one that happened to materialize. After all, if timing was Stokes's driving concern, a decision of this court the day *after* the settlement would have equally falsified his and Harbor's assumption that the appeal was likely to drag on for another year, and would have made Stokes kick himself just as harshly for the misfortune of having settled.

Stokes argues that he should nevertheless prevail under Restatement § 157, which says that "[a] mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from avoidance ... unless his fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." Stokes implies that if he should lose, it could only be because we have implicitly regarded his conduct as in some way negligent. But our conclusion that the settlement should be upheld is based on an inference as to risk allocation, not on a finding of negligence or other fault.

We note that in *Farhat v. Rassey*, 295 Mich. 349, 294 N.W. 707 (1940), the court allowed avoidance of a settlement contract entered into after the trial court had, without the parties' knowledge, filed its opinion. Though recognizing that the parties had allocated the risk as to the *outcome* of the lawsuit, the court seemed to think they had not allocated the risk of pre-settlement judicial disposition. Because we see that risk as nestled firmly within the basic risk as to outcome and timing, we disagree. Because the District of Columbia Court of Appeals has adopted § 154 of the Restatement, we believe that it would as well.

The judgment of the district court is

*Affirmed.*